IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JEREMY RODRIGUEZ-ORTEGA AND
JOSHUA RODRIGUEZ,
           Plaintiffs,

v.                                               No. 21-cv-01129-JCH-KK

DAVID RICH, KENNETH LUCERO,
in their official and individual capacities, AND
NEW MEXICO DEPARTMENT OF HEALTH
           Defendants,


## PLAINTIFFS' FIRST AMENDED MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiffs Jeremy Rodriguez-Ortega and Joshua Rodriguez, by and through their counsel of record, Heather Burke, with their Motion for Summary Judgment.


## I.  STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Mr. Rodriguez and Mr. Rodriguez-Ortega were employed by the State of New Mexico Department of Health.

2. The State of New Mexico employs over 50 employees, and is therefore an employer under the FMLA

3. Mr. Rodriguez-Ortega had worked for Defendants for over 12 months, and had worked over 1250 hours in the preceding 12 months. **[Exhibit 1 - NMDOH Rodriguez-Ortega No. 0331-340 and Exhibit 2 - NMDOH Rodriguez-Ortega No. 0351-361]**

4. Mr. Rodriguez-Ortega's Polycystic Kidney Disease (PKD) and Pancreatitis are FMLA qualifying medical conditions.  **[Exhibit 1 - NMDOH Rodriguez-Ortega No. 0331-340 and Exhibit 2 - NMDOH Rodriguez-Ortega No. 0351-361]**

5. Defendant Rich is/was the Human Resources Bureau Labor Manager at NMDOH, and was Mr. Rodriguez-Ortega's direct manager.  **[Exhibit 3 - Deposition of David Rich, Pg 18, lines 5-6]** Defendant Rich is/was also the ADA coordinator at NMDOH. **[Exhibit 3 - Deposition of David Rich, Pg 18, lines 11-12]**

6. David Rich is an employer under the FMLA as he acted directly and/or indirectly in the interest of NMDOH. He supervised and controlled Plaintiff's work, had the power to hire and/or fire Plaintiff, and control over his FMLA leave.  **[Exhibit 3 - Deposition of David Rich, Pg 18, lines 5-6] [Exhibit 25 - NFA] [Exhibit 1 - NMDOH Rodriguez-Ortega No. 0331-340 and Exhibit 2 - NMDOH Rodriguez-Ortega No. 0351-361] [Exhibit 9 - Deposition of David Rich, Pg 84, lines 15-20]**

7. NMDOH Absence and Other Leave Policy requires Employees to call in to request unanticipated leave no later than 30 minutes after the start of their scheduled workday.  **[Exhibit 4 - NMDOH Absences and Other Leave Policy pg 4]**

8. Defendant Rich testified that his employees were marked AWOL if they didn't call in 30 minutes before the start of their shift.  **[Exhibit 5 - Deposition of David Rich, Pg 111, lines 6-10]**

9. On the evening of February 20, 2020, Mr. Rodriguez-Ortega was unexpectedly hospitalized due to his FMLA qualifying medical conditions. Mr. Rodriguez-Ortega was incapacitated by his medical condition and treatment and was not able to notify Defendants of his hospitalization. **[Exhibit 30[1] - Testimony of Jeremy Rodriguez-**

---

[1] It is unknown whether this Court has finally received the administrative records from SPO, but for the Court's convenience, Plaintiffs have provided an unofficial transcription of the sections of Mr. Rodriguez-Ortega's testimony referenced herein.

**Ortega, SPB Hearing 6/11/21 1:18:44 – 22:10] [First Amended Complaint ("FAC")**

**#23]**

10. Defendant Rich was very concerned for Plaintiff's health and was "ready to do a wellness check on him" and contacted Mr. Rodriguez-Ortega's brother, Joshua Rodriguez, at work on or about February 21, and learned that Mr. Rodriguez-Ortega was hospitalized.

    **[Exhibit 6 - Deposition of David Rich, Pg 34, lines 5-9]**

11. When Mr. Rodriguez-Ortega returned to work, Defendant Rich asked him to submit FMLA certification. **[Exhibit 7 - Deposition of David Rich, Pg 38, lines 4-6]**

12. Defendant Rich testified that he gave Mr. Rodriguez-Ortega the "opportunity" to correct his "behavior" of not notifying Defendant Rich of his whereabouts during his incapacitation and hospitalization. **[Exhibit 8 - Deposition of David Rich, Pg 117, lines 8-11, line 20-22]**

13. Defendant Rich had Mr. Rodriguez-Ortega complete two different intermittent FMLA certification forms for the same qualifying medical conditions. **[Exhibit 1 - NMDOH Rodriguez-Ortega No. 0331-340 and Exhibit 2 - NMDOH Rodriguez-Ortega No. 0351-361]**

14. Both clearly stated he had been hospitalized in February 2020. **[Exhibit 1 pg 5 - NMDOH Rodriguez-Ortega No. 0335, Exhibit 2 pg 5 - NMDOH Rodriguez-Ortega No. 0355]**

15. Defendant Rich retroactively applied Mr. Rodriguez-Ortega's FMLA coverage to July 2019. **[Exhibit 9 - Deposition of David Rich, Pg 84, lines 15-20]**

16. Defendant Rich marked Mr. Rodriguez-Ortega AWOL for three of the days Mr. Rodriguez-Ortega was hospitalized and recovering from his hospitalization. **[Exhibit 10 - 2ndRFP7.00088-00089]**

17. Defendant Rich testified that even after retroactive FMLA was granted, Mr. Rodriguez-Ortega was still AWOL while in the hospital because he hadn't notified Defendant Rich of his whereabouts. **[Exhibit 11 - Deposition of David Rich, Pg 110, lines 4-25, pg 111 line 1-10]**

18. The other days were designated FMLA, including February 27, which was entered as part FMLA and part AWOL. **[Exhibit 10 - 2ndRFP7.00088-00089]**

19. Defendant Rich testified that if an employee does not notify their employer where they are, regardless of the reason, they are AWOL. **[Exhibit 12 - Deposition of David Rich, Pg 114, lines 24-25, pg 115 line 1]**

20. Mr. Rodriguez-Ortega was facing a five-day suspension for being marked AWOL while hospitalized in February 2020. **[Exhibit 12 - Deposition of David Rich, Pg 114-115, lines 19 -7]**

21. Defendant Rich Testified that Mr. Rodriguez-Ortega was marked AWOL because he did not notify Defendant Rich of his whereabouts. **[Exhibit 13 - Deposition of David Rich, Pg 109, lines 11-14]**

22. Mr. Rodriguez-Ortega was not AWOL in February 2020 for any days except those during his hospitalization and recovery for his FMLA qualifying conditions. **[Exhibit 10 - 2ndRFP7.00086-00089]**

23. Defendant Rich testified that an employee who is hospitalized is required to notify him 30 minutes before their shift starts. **[Exhibit 14 - Deposition of David Rich, Pg 110, line 21-25, Pg 111, Lines 1-2]**

24. Defendant Rich testified that an employee on intermittent FMLA is AWOL if they do not notify him 30 minutes before their shift. **[Exhibit 14 - Deposition of David Rich, Pg 111, line 6-10]**

25. Defendant Rich testified that the FMLA does not relieve an employee of their obligation to notify their employer that they aren't working. **[Exhibit 14 - Deposition of David Rich, Pg 112, lines 11-14]**

26. Defendant Rich told Mr. Rodriguez-Ortega that he had to notify Defendant Rich when he was going to be out and if he did not, he would be marked AWOL. **[Exhibit 15 - Deposition of David Rich, Pg 114, line 1 - 9]**

27. Defendant Rich testified that the FMLA requires that there must be notification of the need for leave prior to taking FMLA leave. **[Exhibit 16 - Deposition of David Rich, Pg 110, line 10 - 20]**

28. Defendant Rich told Mr. Rodriguez-Ortega that in lieu of facing discipline for the days he was marked AWOL, he could apply for early disability retirement. **[Exhibit 17 - Deposition of David Rich, Pg 113 lines 18-25, Pg 114, lines 10-15]**

29. On May 1, 2020, Defendant Rich sent an email to Mr. Rodriguez-Ortega stating "You were given a huge opportunity, out of our concern for your rapidly deteriorating health, in late February when you had at least 3 incidents of AWOL. The opportunity, rather than face discipline, was to look into medical retirement, et cetera vs. facing up to a 5-day suspension for your AWOLs. You were then provided time to research and look into all

these matters and the only option you pursued was ALD and to update your FMLA. My extreme leniency with you is coming to end." **[Exhibit 18 - David Rich May 1, 2020 email]**

30. Defendant Rich testified that after marking Mr. Rodriguez-Ortega  AWOL for not notifying Defendant Rich of his whereabouts in February, he did not further discipline him because he knew the absences were due to his "medical needs" **[Exhibit 19 - Deposition of David Rich, Pg 118 lines 17-25, Pg 119, lines 1-7]**

31. Employees marked AWOL "shall not be paid for any periods of AWOL and shall not accrue sick or annual leave" **[Exhibit 4 - "NMDOH Absences and other Leave Policy" pg 11]**

32. On May 4, 2020, Mr. Rodriguez-Ortega sent a text to Defendant Rich stating that he was on his way to the ER and would not be working for the rest of the day and would be in touch. **[FAC #67] [Exhibit 20 - May 4, 2020 Text]**

33. Mr. Rodriguez-Ortega was admitted and released from the hospital and/or ER multiple times over the following days, and was incapacitated by pain and the narcotic pain medication prescribed to treat his conditions. He required caregivers during this period due to his incapacitation and inability to care for himself.  **[Exhibit 30 - Testimony of Jeremy Rodriguez-Ortega, SPB Hearing 6/11/21 01:34:36- 36:18] [FAC #67-70]**

34. Defendant Rich recognized that Mr. Rodriguez-Ortega's text was giving notice of invoking his FMLA leave and marked the rest of that day as FMLA leave.  **[Exhibit 21 - 2nd RFP 7.00108]**

35. Defendant Rich testified that he did not remember taking any steps to ascertain whether Mr. Rodriguez-Ortega was using his Family and Medical Leave after entering one day of

FMLA leave on May 4, 2020.  **[Exhibit 22 - Deposition of David Rich, Pg 100, lines 18-20]**

36. When Defendant Rich did not hear from Mr. Rodriguez-Ortega 30 minutes before his shift for the next 9 work days, he was marked AWOL by Defendant Rich. **[Exhibit 21 - 2nd RFP 7.00108-109**] **[Exhibit 23 - Deposition of David Rich, Pg 120, lines 19-20]**

37. Defendant Rich testified he marked Mr. Rodriguez-Ortega AWOL because he violated both "policy" and "professional courtesy" by not notifying Defendant Rich of his whereabouts. **[Exhibit 24 - Deposition of David Rich, Pg 114, lines 22-25, Pg 115 Line 1]**

38. Defendant Rich did not contact Plaintiff until May 15, 2020, when he called Mr. Rodriguez-Ortega and immediately yelled at Plaintiff that he had been marked AWOL, and would face discipline for failing to follow DOH policy.  **[Exhibit 30 - Testimony of Jeremy Rodriguez-Ortega, SPB Hearing 6/11/21 1:36:22 – 36:59][FAC #73]**

39. Mr. Rodriguez-Ortega was under the influence of heavy narcotic medication.  He tried to tell Defendant Rich that he had been hospitalized, but Defendant Rich just talked over him. **[Exhibit 30 - Testimony of Jeremy Rodriguez-Ortega, SPB Hearing 6/11/21 1:38:23 – 39:04] [FAC #76]**

40. Mr. Rodriguez-Ortega testified that he believed that he could not invoke his FMLA because he had not been able to comply with DOH's call in policy and had been told he would be marked AWOL if he did not, regardless of the reason for his absence. **[Exhibit 30 - Testimony of Jeremy Rodriguez-Ortega, SPB Hearing 6/11/21 01:41:13- 42:03] [FAC #75]**

41. Mr. Rodriguez-Ortega was served a Notice of Final Action dated July 22, 2020 which terminated his employment for "inappropriate and unprofessional behavior, negligence in the performance of your duties, insubordination, failure to be ready to work, and for being Absent Without Leave (AWOL) four(4) of more times within a 12 month period." **[Exhibit 25 - NFA]**

42. Defendant Rich attached as exhibits in support of this termination, Mr. Rodriguez-Ortega's text en route to the hospital, and the May 5-15 timesheets showing that Mr. Rodriguez-Ortega was marked AWOL while he was hospitalized and/or incapacitated. **[Exhibit 25 - NFA page 4]**

43. Parties agree that Mr. Rodriguez-Ortega 's termination was because of his nine absences, marked as AWOL, in May 2020. **[Doc 23 and 25] [FAC #81]**

44. Defendants admit that both brothers suffer from disabilities and/or medical conditions. **[FAC #11]**

45. Defendants admit that Mr. Rodriguez applied for, was scheduled to interview for the position of Vaccine Outreach Manager on or around December 16, 2019. **[FAC #17]**

46. Mr. Rodriguez was asked to fill out accommodations paperwork before his scheduled interview on or around December 16, 2019. **[FAC #18][ Exhibit 26 - DOH RRFP 3-000019-22]**

47. Defendants admit that Mr. Rodriguez refused to fill out the accommodations paperwork, and they admit that he was not offered the Vaccine Outreach Manager position and was subsequently ranked 5th out of 5 applicants. **[FAC #19][ Exhibit 27 - DOH RRFP 3-000001]**

48. Defendants admit that Mr. Rodriguez reported what he believed to be an illegal job interview requirement to David Rich at the end of December 2019 and beginning of January 2020.  **[FAC #20 and 21][ Exhibit 28 - 2nd RRFP 5.000491]**

49. Defendants admit that David Rich sent an email to Kenneth Lucero and others on January 15, 2020 discussing Mr. Rodriguez's complaint, identifying him by name and work location stating "The employee is using words like "discrimination," "illegal," et cetera. I'm trying to resolve this so that he doesn't file an EEOC complaint which he would probably win! His name is Joshua Rodriguez and he currently works for PHD in the pharmacy warehouse."  **[FAC #22][ Exhibit 28 - 2nd RRFP 5.000490-491]**

50. Defendants admit that David Rich and L. Teresa Padilla had a meeting with Jeremy Rodriguez-Ortega on or around March 2, 2020, in which they informed him that his job duties were being reassigned, and from then on, his primary responsibility would be qualifying for early disability retirement in lieu of being suspended for 5 days for being AWOL while he was hospitalized and recovering. David Rich told him how terrible he looked and that he should be focusing on his health instead of working. **[FAC #29]**

51. Defendants admit that Mr. Rodriguez-Ortega told David Rich that he did not want to retire early and that he felt that he would be "failing himself" if he did so.  **[FAC #30]**

52. Defendants admit that Mr. Rodriguez was directed by Ron Ulibarri to address a violation of DOH Weapons Policy with Vandora Montoya and Chasedy Vela on March 9, 2020 for having a stun gun on DOH premises. **[FAC #39]**

53. Defendants admit that also on March 9, 2020, Vandora Montoya contacted Ken Lucero about the weapons policy, and in this same conversation, reported Mr. Rodriguez for sexual harassment.  **[FAC #40]**

54. Defendants admit that a Violation of the DOH Weapons policy is the same level disciplinary violation as sexual harassment, and can result in immediate termination. **[FAC #41]**

55. Defendants admit that Ken Lucero asked David Rich for permission to investigate Joshua Rodriguez for sexual harassment. He did not ask David Rich for permission to investigate the violation of weapons policy. David Rich gave permission to investigate Joshua Rodriguez. **[FAC #42]**

56. Defendants admit that none of the witnesses were even asked to corroborate each other's stories, yet Mr. Lucero treated each allegation as though it had been substantiated. **[FAC #43]**

57. Defendants admit that Ken Lucero had already decided Mr. Rodriguez was guilty when he was interviewed on March 12, 2020, and Defendant Lucero lied to Mr. Rodriguez about having recordings as evidence against him in this interview. **[FAC #44]**

58. Defendants admit that there was no actual evidence of any wrongdoing by Mr. Rodriguez, and that they did not give any weight to the fact that the accusers had just been confronted by Mr. Rodriguez about a terminable violation of DOH policy, and/or were widely known to not like Mr. Rodriguez. **[FAC #45]**

59. Defendants admit that by accusing Mr. Rodriguez of sexual harassment, Vandora Montoya and Chasedy Vela both avoided any investigation or discipline for their violation of DOH Weapons Policy**. [FAC #47]**

60. Defendants admit that Mr. Rodriguez-Ortega received no communications and was assigned no work from David Rich or his coworkers while he was working from home, and that Mr. Rodriguez-Ortega's coworkers had been assigned his job duties **[FAC #49]**

61. Defendants admit that Defendant Lucero's investigation of Mr. Rodriguez was completed on April 14, 2020, and contained many misrepresentations and fraudulent statements, all of which went against Mr. Rodriguez and that Mr. Lucero's report recommended termination. **[FAC #51]**

62. David Rich made the final decision on Mr. Rodriguez's discipline.  **[Exhibit 29 - Ken Lucero deposition pages 118 ln 21-25, page 119 ln 1-4]**

63. Defendants admit that Ron Ulibarri and Chris Novak were also found to have violated the same policy as Mr. Rodriguez was alleged to have violated, but Mr. Lucero did not recommend any discipline for either man, and neither was disciplined in any way.  **[FAC #52]**

64. Defendants admit that all decisionmakers in Mr. Rodriguez's termination relied completely on Defendant Lucero's recommendation.  **[FAC #53 ]**

65. Defendants admit that the DOH disciplinary Policy creates an implied contract **[FAC #151]** and that they violated DOH policy by retaining and using old and unrelated verbal counseling statements against Mr. Rodriguez to substantiate his termination.  **[FAC #54 and 55]**

66. Defendants admit that on the same day David Rich approved the NCA against Mr. Rodriguez proposing terminating his employment using years old verbal counseling statements in support of it, he sent an angry email to Mr. Rodriguez-Ortega claiming that Mr. Rodriguez-Ortega had failed to complete an assignment, that Mr. Rodriguez-Ortega's coworkers were doing 99% of Mr. Rodriguez-Ortega's work duties while his health degraded and revoking his ability to use FLEX time. This email told Mr. Rodriguez-Ortega to have work completed by April 27 **[FAC #56 and 57]**

67. Defendants admit that David Rich sent no emails to Mr. Rodriguez-Ortega before April 24, 2020 while Mr. Rodriguez-Ortega was working from home.  **[FAC #58]**

68. Defendants admit that on May 1, 2020, Defendant Rich sent another angry email to Mr. Rodriguez-Ortega, this time claiming that the assignment due on April 27 had been due on April 20 and was never completed.  **[FAC #61]**

69. Defendants admit that Defendant Rich did not attempt any other method of communication with Mr. Rodriguez-Ortega when his two emails sent April 24, and May 1 went unanswered. **[FAC #62]**

70. Defendants admit that Defendant Rich told Mr. Rodriguez-Ortega "You were given a huge opportunity, out of our concern for your rapidly deteriorating health, in late February when you had at least 3 incidents of AWOL. The opportunity, rather than face discipline, was to look into medical retirement, et cetera vs. facing up to a 5-day suspension for your AWOLs. You were then provided time to research and look into all these matters and the only option you pursued was ALD and to update your FMLA. My extreme leniency with you is coming to end." **[FAC #64]**

71. Defendants admit that the 3 incidents of AWOL that David Rich refers to in his email are days that Mr. Rodriguez-Ortega was hospitalized and absent due to his FMLA covered condition. **[FAC #65]**

72. Defendants admit that Defendant Rich also stated "Unfortunately your conduct and lack of work effort has left are extremely busy office to be handled by four rather than five employees. Your teammates have picked up **all** your work assignments, without complaint and we are all having to work harder because you are not. Going forward you are to send me an appointment invite in Outlook for any and all medical appointments

with an explanation as to how you code your time in SHARE for the appointment." **[FAC #66]**

73. Defendants admit that on May 4, 2020 Mr. Rodriguez-Ortega sent a text notifying Defendant Rich that he was on the way to the ER, and that he was given heavy duty painkillers while there.  **[FAC #67]**

74. Defendants admit that after being released, Mr. Rodriguez-Ortega was prescribed a continuing dose of heavy-duty narcotic painkillers which kept him incapacitated. **[FAC #68]**

75. Defendants admit that Mr. Rodriguez-Ortega returned to the ER on May 8, 2020 and released again under heavy narcotic painkillers which kept him incapacitated. **[FAC #69]**

76. Defendants admit that Mr. Rodriguez-Ortega was admitted to the hospital for 3 days on May 13, and was released on May 15 **[FAC #70]**

77. Defendants admit that Defendant Rich did not attempt to contact Mr. Rodriguez-Ortega from after receiving his text on May 4th to see how he was doing, whether he was taking FMLA leave, or when he might be back to work.  **[FAC #71]**

78. Defendants admit that Defendant Rich did not try to contact Mr. Rodriguez, who was still employed by NMDOH, to find out where Mr. Rodriguez-Ortega was, or how he was doing, like he had done in February 2020.  **[FAC #72]**

79. Defendants admit that Defendant Rich's actions created a situation where Mr. Rodriguez-Ortega could not invoke his FMLA for additional leave for recovery from his hospitalization because Defendant Rich told Mr. Rodriguez-Ortega he had to return to work immediately, and was likely facing termination.  **[FAC #77]**

80. Defendants admit that Mr. Rodriguez was issued an NFA on May 19, 2020 which terminated his employment, and which contained no actual evidence of policy violations. **[FAC #78]**

81. Defendants admit that the same day Mr. Rodriguez was terminated, Defendant Rich emailed Mr. Rodriguez-Ortega thanking Mr. Rodriguez-Ortega for contacting PERA about early disability retirement. **[FAC #79]**

82. Defendants admit that the AWOL dates used to support Mr. Rodriguez-Ortega's NCA and NFA were the dates he was hospitalized and incapacitated by his FMLA protected conditions and/or treatment thereof. **[FAC #81]**

83. Defendants admit that ALJ Haught allowing Vandora Montoya to testify and be cross examined while holding her newborn unfairly increased her credibility and made it more difficult to cross examine her. **[FAC #88]**

84. Defendants admit that not being allowed to attack the credibility of his accusers violated Mr. Rodriguez's due process rights. **[FAC #89]**

85. Defendants admit that in absence of any actual evidence of wrongdoing, ALJ Haught's decision was entirely based her subjective assessment of credibility, which was unfairly impacted by her improper rulings. **[FAC #87]**

86. Defendants admit that there are no records showing a similarly situated NMDOH employee who was terminated based on a single finding of sexual harassment **[FAC #91]**

87. Defendants admit that it is per se unreasonable to discipline Mr. Rodriguez more harshly than all other similarly situated employees. **[FAC #92]**

## II.    <u>ARGUMENT</u>

Summary Judgment is appropriate when there are no genuine disputes of material fact to necessitate trial.  "Summary judgment generally is appropriate when a court determines that there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Slusser v. Vantage Builders, Inc.,* 576 F. Supp. 2d 1207, 1208 (D.N.M. 2008) "Summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *United States v. Thrasher*, No. CV 08-172 MCA/WPL, 2009 U.S. Dist. LEXIS 94606, at *5-7 (D.N.M. Aug. 26, 2009)(citing FED. R. Civ. P. 56(c)).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Lopez v. Delta Int'l Mach. Corp.*, 312 F. Supp. 3d 1115, 1125 (D.N.M. 2018).  However, when no answer is filed, under Rule 8(b)(6), Courts must deem the factual allegations in the operative complaint admitted, and any affirmative defenses waived.


## <u>Rule 8(b)(6) Admissions for Summary Judgment</u>

An allegation of the complaint is admitted if "a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6) *Martinez v. Naranjo*, 328 F.R.D. 581, 599 (D.N.M. 2018) This is especially true when no answer at all has been filed.

> By failing to submit an answer or other pleading denying the factual allegations of
> Plaintiff's complaint, Defendant admitted those allegations, thus placing no
> further burden upon Plaintiff to prove its case factually. Fed. R. Civ. P. 8(d)
> ("Averments in a pleading to which a responsive pleading is required . . . are

admitted when not denied in the responsive pleading."). Defendant certainly would have been entitled to file an answer upon the district court's denial of the motion to dismiss…but chose not to.

*Burlington N. R.R. Co. v. Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996)  See also *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968) (affirming summary judgment where defendant had never filed an answer) *Sec. USA Servs., LLC v. Invariant Corp.*, No. 1:20-cv-01100-KWR-KRS, 2023 U.S. Dist. LEXIS 46962, at \*10-11 (D.N.M. Mar. 20, 2023) ("Moreover, Plaintiff did not file an answer to Defendants' counterclaims. This constitutes an admission of the factual allegations in the Defendants' counterclaim.")  Of course, even once the allegations in a complaint are deemed admitted, the Court still must determine that summary judgment is appropriate.

> [I]n granting summary judgment based upon a failure to respond, a district court must still determine that summary judgment is appropriate. Fed. R. Civ. P. 56(e)(3) advisory committee's notes to 2010 amendment ("Once the court has determined the set of facts — both those it has chosen to consider undisputed for want of a proper response or reply and any that cannot be genuinely disputed despite a procedurally proper response or reply — it must determine the legal consequences of these facts and the permissible inferences from them.")

*Perez v. El Tequila, LLC*, 847 F.3d 1247, 1254-55 (10th Cir. 2017) "Summary judgment generally is appropriate when a court determines that 'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Elisberg v. Presbyterian Healthcare Servs.*, No. 05-CV-461 JCH/KBM, 2006 U.S. Dist. LEXIS 113660, at \*2 (D.N.M. Aug. 10, 2006)(quoting *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993))

The granting of summary judgment pursuant to Rule 8(b)(6) is not a sanction, but merely the effect of failing to deny allegations.  *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1254 (10th Cir. 2017).

Here, Defendants' answer to Plaintiffs' First Amended Complaint was due on or around February 23, 2023. They sought a two-week extension, making their answer due March 7, 2023. [Doc. 29] While Plaintiffs filed an Opposed Motion for Leave to Amend their complaint in May 2023, this does not relieve Defendants of their obligation to timely respond to Plaintiffs' First Amended Complaint. Defendants have never answered Plaintiffs' First Amended Complaint, and therefore pursuant to Rule 8(b)(6) this Court must deem all factual allegations in Plaintiffs' First Amended Complaint, except for those to amount of damages, admitted. By evidence and by Defendants' own admissions, there exists no reasonable dispute of material fact on any of Plaintiffs' claims, and therefore this Court must grant Summary Judgment on them, and set a trial by jury on the issue of damages.

### A. Mr. Rodriguez-Ortega Is Entitled to Summary Judgement As A Matter Of Law Of His FMLA Interference Claim.

A plaintiff on an FMLA interference claim must establish the following: (1) that he was entitled to FMLA leave; (2) that some adverse action by the employer interfered with his right to take FMLA leave; and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights. *Dalpiaz v. Carbon County*, 760 F.3d 1126, 1132 (10th Cir. 2014) *Gambro v. Campbell Healthcare, Inc*., 478 F.3d 1282, 1287 (10th Cir. 2007), citing *Jones v.Denver Pub. Schs*., 437 F.3d 1315, 1318 (10th Cir. 2005). The employer bears the burden of proof on the issue of whether the employer's actions were related to the exercise or attempted exercise of the employee's FMLA rights where the employee has shown some adverse action interfering with the right to use FMLA leave. *Dalpaz*, 760 F.3d at 1132; *Gambro*, 478 F.3d at 1287; *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).

Where an employer interferes with the employee's right to FMLA leave, the deprivation

constitutes a violation of the FMLA regardless of employer intent. *Brown v. ScriptPro, Inc.*, 700 F.3d 1222, 1226-27 (10th Cir. 2012); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955,960 (10th Cir. 2002). Under an interference theory, the employee must simply demonstrate an entitlement to the disputed leave. Smith, 298 F.3d at 960. The McDonnell-Douglas framework is not applicable to FMLA interference claims. *ScriptPro, Inc.*, 700 F.3d at 1226-27. Consequently, a pretext analysis is not necessary in determining FMLA interference claims. Id. at 1228.

**B.  The Application of the Law of FMLA Interference to the Undisputed Material Facts of This Case.**

To qualify for FMLA, an employee must have worked for the employer for 12 months and have worked 1250 hours in the past 12-month period "immediately preceding the commencement of the leave" 29 CFR § 825.110(a)(2). An employer is subject to extensive notice requirements under the FMLA. See 29 C.F.R. § 825.300. Among other things, the employer must give the employee notice of FMLA leave eligibility and rights, notice of how leave is designated and treated, any requirement for providing a certificate validating a health condition, and any fitness-for-duty certification required as a condition for return to work.

29 C.F.R. § 825.300(b)(1) requires "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days.... Employee eligibility is determined (and notice must be provided) at the commencement of the first instance of leave for each FMLA-qualifying reason in the applicable 12-month period."

Failure to follow the notice requirements may constitute an interference with an employee's FMLA rights, if the employee is prejudiced thereby. *Crites v. City of Haysville*, No. 16-1397-JWB, 2018 U.S. Dist. LEXIS 82318, at *23-24 (D. Kan. May 16, 2018).  "Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his leave differently" *Id.*, at *27 (D. Kan. May 16, 2018) (citing *Vannoy v. Fed. Res. Bank of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016)). 29 CFR § 825.220 (b) Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act.

Here, there is no dispute between parties that Mr. Rodriguez-Ortega had FMLA qualifying conditions, and that he was entitled to protected leave for those conditions.  There is also no legitimate dispute that Defendant Rich qualifies as an employer under the FMLA.  As detailed below, Defendant Rich repeatedly interfered with Mr. Rodriguez-Ortega's FMLA rights as a matter of Law when he repeatedly failed to designate Mr. Rodriguez-Ortega 's leave as FMLA and instead marked him AWOL for that leave, and then terminated him for being AWOL.

**1.  Defendant Rich Interfered with Mr. Rodriguez-Ortega's Exercise Of FMLA When Defendant Rich marked Mr. Rodriguez-Ortega AWOL while Mr. Rodriguez-Ortega was in the hospital and while recovering from his hospitalization for his FMLA qualifying conditions in February 2020.**

As a matter of law, marking an employee AWOL for taking FMLA protected leave constitutes impermissible interference with FMLA rights under 29 CFR § 825.220. "Absent Without Leave (AWOL)" means leaving while on an assigned shift/regular work schedule, failing to report within the first hour of any assigned shift/regular work schedule without authorization, having an unauthorized absence, or appearing for work in violation of Department policy governing readiness for work. (NMDOH Absence and Leave Policy)

29 CFR § 825.220 prohibits the interference with an employee's FMLA rights. This includes discharging, restraining, denying the exercise of, or discriminating against an employee who has asserted their rights. "Employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). This includes applying stricter notice requirements to the employee. "Timing of notice. When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303 (a). While under normal circumstances, an employee is expected to follow employer notice policies, when the need for leave is not foreseeable that is not always possible. "Complying with employer policy. When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require employees to call a designated number or a specific individual to request leave. However, if an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her condition is stabilized and he or she has access to, and is able to use, a phone." 29 C.F.R. § 825.303 (c)

In this case, there is absolutely no legitimate issue of material fact that Defendant Rich interfered with Mr. Rodriguez-Ortega's FMLA rights in February 2020. Mr. Rodriguez-Ortega had worked for State of New Mexico for about 18 years, and therefore more than the year of work required, he had worked more than 1250 hours in the preceding year, he had two FMLA qualifying conditions and he had previously been certified for intermittent FMLA leave. **[UMF 3 and 4]** Although he should only have had to submit one certification, Mr. Rodriguez-Ortega submitted two certification forms at Defendant Rich's request. There is no legitimate dispute

that Defendant Rich is an employer under the FMLA, as he had substantial perhaps even total control over Mr. Rodriguez-Ortega's FMLA application, approval and designation. He also was Mr. Rodriguez-Ortega's direct manager who assigned his work duties, approved all leave, disciplined him, and signed his termination. **[UMF 5 and 6]** See *Cordova v. New Mexico*, 283 F. Supp. 3d 1028, 1040 (D.N.M. 2017) ("We believe this language means that an individual is subject to FMLA liability when he or she exercises "supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation" while acting in the employer's interest.") (quoting *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 417 (3d Cir. 2012))

<u>Both</u> certification forms state that Mr. Rodriguez-Ortega had been hospitalized February 20-23, 2020. **[UMF 13 and 14]** Defendant Rich retroactively designated July 2019 to July 2020 as Mr. Rodriguez-Ortega's FMLA coverage period after receiving these certifications. There is no legitimate dispute that Mr. Rodriguez-Ortega was in the hospital, and then recovering from this hospitalization from February 21 through March 1. **[UMF 14]** Yet Defendant Rich marked Mr. Rodriguez-Ortega "Absent Without Leave" ("AWOL") multiple times during this period.**[UMF 16]** Defendant Rich repeatedly testified that the NMDOH call in policy took precedent over Mr. Rodriguez-Ortega's FMLA rights, and his failure to notify Defendant Rich 30 minutes before his shift started meant he was AWOL.**[UMF 8, 12, 16, 17, 19, 21, 23, 24, 25, 26, 27, 30, 37]** However, Mr. Rodriguez-Ortega 's federal rights were not determined by Defendant Rich. See *Cordova v. New Mexico*, No. 16-CV-1144-JAP-JHR, 2018 U.S. Dist. LEXIS 188027, at *10 (D.N.M. Nov. 2, 2018). ("Eligibility for FMLA leave is determined by federal law, and not by the employer.")

In actual fact, NMDOH policy actually requires notice <u>within</u> 30 minutes of the start of the work day, not 30 minutes before, so Defendant Rich was impermissibly applying his own stricter rules to Plaintiff even if it were required for Plaintiff to adhere to this requirement in this specific instance. **[UMF 7]**  But in this instance, it is the FMLA that sets the requirements when leave is unforeseeable and the employee is incapacitated or otherwise unable to give notice due to the health condition and/or treatment for same, like Mr. Rodriguez-Ortega's case.  For unforeseen leave, FMLA requires notice to be given as soon as practicable under the circumstances. 29 C.F.R. § 825.303 (c)This takes into consideration the specific facts, recognizing that there are times, as here, when an employee may be hospitalized and/or incapacitated for a period of time and unable to give notice.  Defendant Rich learned that Mr. Rodriguez-Ortega was hospitalized from his brother, Joshua Rodriguez. **[UMF 10]** And this fact was independently corroborated by two different doctors. Mr. Rodriguez-Ortega's FMLA certification forms, signed by two different doctors, <u>both</u> confirmed that he had been hospitalized due to his FMLA qualifying conditions.  **[UMF 14]** Yet, Defendant Rich cherry picked days during Mr. Rodriguez-Ortega's FMLA leave to mark him AWOL, even going so far as to mark him ½ a day AWOL and ½ day FMLA while he was hospitalized.  **[UMF 16]**

Defendant Rich interfered with Mr. Rodriguez-Ortega's FMLA rights when he marked Mr. Rodriguez-Ortega AWOL because he had not called in 30 minutes before his shift while he was hospitalized and incapacitated. **[UMF 16]**   Being marked AWOL is an adverse action. **[UMF 31]**  Not only does it potentially lead to further discipline**[UMF 20]**  , but it means the employee does not get paid for that day, as they cannot use paid sick or vacation leave and they do not accrue that leave, either. **[UMF 31]**     In addition, it affects an employee's retirement. Besides the actual monetary damage Mr. Rodriguez-Ortega suffered from Defendant Rich's

interference, the bigger damage was that Defendant Rich's interference discouraged Mr.

Rodriguez-Ortega from invoking his FMLA rights again, and made him believe that he could

not, absent false conditions.  **[UMF 40]**

As a matter of law, there is no dispute Mr. Rodriguez-Ortega was qualified for FMLA,

was hospitalized because of his FMLA qualifying conditions, and that the taking of his FMLA

leave was interfered with by Defendant Rich when Defendant Rich marked Mr. Rodriguez-

Ortega AWOL instead of properly designating all his time in the hospital, and in recovery, as

FMLA protected leave. This interference denied Mr. Rodriguez-Ortega compensation, retirement

benefits, and leave accrual, and discouraged him from full use of FMLA.

**2. Defendant Rich Interfered with Mr. Rodriguez-Ortega's FMLA in May 2020
when he marked Plaintiff AWOL while he was hospitalized and/or incapacitated
related to his FMLA qualifying condition.**

29 CFR § 825.220 prohibits the interference with an employee's FMLA rights.  This

includes discharging, restraining, denying the exercise of, or discriminating against an employee

who has asserted their rights.  "Employers cannot use the taking of FMLA leave as a negative

factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. §

825.220(c).  This includes applying stricter notice requirements to the employee.  "Timing of

notice. When the approximate timing of the need for leave is not foreseeable, an employee must

provide notice to the employer as soon as practicable under the facts and circumstances of the

particular case."  29 C.F.R. § 825.303 (a).

If there is any question about the reason for leave, federal law imposes a duty of reasonable

investigation on the employer:

(a) Employer responsibilities. The employer's decision to designate leave as
FMLA-qualifying must be based only on information received from the employee
or the employee's spokesperson (e.g., if the employee is incapacitated, the

employee's spouse, adult child, parent, doctor, etc., may provide notice to the employer of the need to take FMLA leave). **In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA-qualifying**. 29 C.F.R. § 825.301. (emphasis added)

An employee need not use certain words to provide notice of his need for leave:

An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave and otherwise satisfy the notice requirements set forth in § 825.302 or § 825.303 depending on whether the need for leave is foreseeable or unforeseeable. 29 C.F.R. § 825.301

While under normal circumstances, an employee is expected to follow employer notice policies, when the need for leave is not foreseeable that is not always possible:

Complying with employer policy. When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require employees to call a designated number or a specific individual to request leave. However, if an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her condition is stabilized and he or she has access to, and is able to use, a phone. 29 C.F.R. § 825.303 (c)

29 C.F.R. § 825.301 states "Remedies. If an employer's failure to timely designate leave in accordance with § 825.300 causes the employee to suffer harm, it may constitute an interference with, restraint of, or denial of the exercise of an employee's FMLA rights."

On May 4, 2020, Mr. Rodriguez-Ortega suffered another flare up of his conditions and had to go to the hospital.  This time, endeavoring to provide proper notice, he sent a text to Defendant Rich, notifying him that he was on his way to the ER. **[UMF 32]**   While Defendant Rich designated part of the day he got the text message as FMLA qualifying leave, **[UMF 34]** he marked each subsequent day as AWOL. **[UMF 36]**   The partial day of designated FMLA

leave demonstrates that Defendant Rich clearly understood that Mr. Rodriguez-Ortega was going to the hospital because of his qualifying conditions, and that FMLA was implicated. **[UMF 34]** Although the text in question promised to follow up, a reasonable person would be able to surmise that Mr. Rodriguez-Ortega's lack of further communication was because he was incapacitated by his emergency treatment and/or medical condition.  However, Defendant Rich refused to designate any additional leave as FMLA qualifying despite having constructive notice that additional leave was likely also FMLA qualifying, nor did he undertake any investigation at all, waiting nearly two full weeks before calling Plaintiff at home. **[UMF 37]**    Instead, he marked Mr. Rodriguez-Ortega  AWOL for nine(9) work days following notice that Mr. Rodriguez-Ortega  was going to the hospital.  **[UMF 36]**

29 C.F.R. § 825.301 imposes a legal duty on the part of the employer to proactively inquire to determine whether leave is FMLA qualifying if they do not have enough information to make that determination.  Here, it would have been reasonable for Defendant Rich to assume that the absences were FMLA related after receiving the hospital text.   Here, there is no evidence that Defendant Rich took any steps to determine whether Mr. Rodriguez-Ortega 's leave should be designated as FMLA protected.  This directly contrasts his effort in February 2020 when Defendant Rich contacted Joshua Rodriguez to enquire where Mr. Rodriguez-Ortega was after only a single day of missed work. **[UMF 10]**    This time Defendant Rich did not attempt to reach out to Joshua Rodriguez[2],or any other of Mr. Rodriguez-Ortega's family members at all. He did not try to contact Mr. Rodriguez-Ortega's doctors, or in any other way attempt to fulfill his legal designation duty to inquire whether the absences on May 5-15 should be designated as FMLA.  **[UMF 35]**

---

[2] Evidence shows that Defendant Rich recommended Joshua Rodriguez's termination only a few days before Jeremy was hospitalized and/or incapacitated.

When he finally called Mr. Rodriguez-Ortega on May 15, 2020, Defendant Rich did not approach Mr. Rodriguez-Ortega from a place of kindness and concern for his welfare. He did not contact him to "inquire" whether Mr. Rodriguez-Ortega 's leave might be FMLA qualifying. **[UMF 38]** Despite testifying that he was considering doing a welfare check for Mr. Rodriguez-Ortega for missing a single day of work in February **[UMF 10],** Defendant Rich waited nine(9) work days or two work weeks to even make contact with Mr. Rodriguez-Ortega. This is after receiving the May 4th text sent en route to the hospital. David Rich testified that "...someone doesn't go to the hospital if they are doing well." **[Deposition of David Rich, Pg 34, line 8 - 9]** He did not ask if Mr. Rodriguez-Ortega was ok, but instead yelled at him, telling him he was marked AWOL for failure to comply with the DOH call in policy and would be disciplined, up to and including termination. **[UMF 38]** Mr. Rodriguez-Ortega had just been released from the hospital again, and was high on narcotic pain medication. **[UMF 39]** Although he tried to tell Defendant Rich that he had been ill, he testified Defendant Rich wouldn't listen. **[UMF 39]** Mr. Rodriguez-Ortega honestly believed Defendant Rich's instruction that FMLA did not protect him if he had not complied with the NMDOH absence and leave policy. **[UMF 40]** Desperate to avoid being terminated for being AWOL while in the hospital and/or incapacitated, he tried whatever he could think of to avoid being fired and told Defendant Rich he had been teleworking instead of in the hospital.

There is no dispute that Mr. Rodriguez-Ortega qualified for FMLA leave, and had been approved for it. He had hundreds of hours left, and his FMLA entitlement would reset again in July 2020. **[UMF 15]** He also had vacation and sick leave so that most, if not all, of that time would have been paid. There is no reasonable dispute that Defendant Rich was properly applying the FMLA or was properly instructing his employees about its requirements. Defendant

Rich's interference with Mr. Rodriguez-Ortega FMLA had convinced Mr. Rodriguez-Ortega that he couldn't use his leave if, for any reason, he had failed to call in each day. **[UMF 23, 24, 25, 26]**    Mr. Rodriguez-Ortega was SO convinced that he couldn't use his leave that he desperately lied about teleworking rather than admit he was hospitalized and incapacitated.  At that heavily medicated moment, he believed lying was the only way to protect himself from being fired, better even than federal law created for just the purpose of protecting his job while he's incapacitated.   Mr. Rodriguez-Ortega did not know that what Defendant Rich had told him was not true until he sought legal counsel after he had already been terminated.

As a matter of law, it is impermissible interference with FMLA to convince your FMLA qualified employees that they cannot use their FMLA if they have been hospitalized, incapacitated, or otherwise unable to call in every morning by 7:30am. (30 minutes before his work day).  There is unequivocal evidence that Defendant Rich routinely denied full FMLA benefits for Mr. Rodriguez-Ortega, and that he resented Mr. Rodriguez-Ortega 's unforeseeable need for leave, finding it discourteous. **[UMF 37]**   There is no legitimate issue of material fact about whether Defendant Rich clearly believed that he could, and did, mark Mr. Rodriguez-Ortega AWOL for not calling in, no matter the reason.  **[UMF 36, 37, 38]**    He testified repeatedly to this, and he actually DID mark Mr. Rodriguez-Ortega AWOL even though he knew he was in the hospital for an FMLA qualifying reason.

### 3. <u>Defendant Rich Interfered with Mr. Rodriguez-Ortega's FMLA when he terminated Plaintiff.</u>

29 CFR § 825.220 prohibits the interference with an employee's FMLA rights.  This includes discharging, restraining, denying the exercise of, or discriminating against an employee who has asserted their rights.  "Employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. §

825.220(c).  This includes applying stricter notice requirements to the employee.  "Timing of

notice. When the approximate timing of the need for leave is not foreseeable, an employee must

provide notice to the employer as soon as practicable under the facts and circumstances of the

particular case."  29 C.F.R. § 825.303 (a).  While under normal circumstances, an employee is

expected to follow employer notice policies, when the need for leave is not foreseeable that is

not always possible.  "Complying with employer policy. When the need for leave is not

foreseeable, an employee must comply with the employer's usual and customary notice and

procedural requirements for requesting leave, absent unusual circumstances. For example, an

employer may require employees to call a designated number or a specific individual to request

leave. However, if an employee requires emergency medical treatment, he or she would not be

required to follow the call-in procedure until his or her condition is stabilized and he or she has

access to, and is able to use, a phone." 29 C.F.R. § 825.303 (c)

Imposing an improper notice burden for an employee to use their FMLA leave both

denies that leave and discourages that employee from using their FMLA leave.  This constitutes

interference with the FMLA.  "Interfering with the exercise of an employee's rights would

include, for example, not only refusing to authorize FMLA leave, but discouraging an employee

from using such leave." 29 C.F.R. § 825.220

Here, there is no dispute of material fact whether Defendant Rich communicated to Mr.

Rodriguez-Ortega that he must notify Defendant Rich of his whereabouts, *without exception*, or

be marked AWOL. **[UMF 24, 25, 26, etc]** Defendant Rich applied an even stricter notice

requirement to his employees, requiring that they call in 30 minutes before their work day for

unforeseen leave, rather than the policy required within 30 minutes of the start of their work day.

**[UMF 7, 24]** Defendant Rich intentionally only designated partial day on May 4th as

FMLA,**[UMF 34]** and steadfastly refused to designate any other days as FMLA because Mr. Rodriguez-Ortega had not called him 30 minutes before his workday each day. **[UMF 36, 37]** Mr. Rodriguez-Ortega believed that he would be marked AWOL for his absence in May because he had not been able to give that notice **[UMF 40]** and his belief was reasonable because Defendant Rich had previously marked him AWOL for not doing so even when there was unequivocal evidence that he was hospitalized in February. **[UMF 16, 17]**   David Rich testified that even after Mr. Rodriguez-Ortega 's FMLA was retroactively granted in March, he was still AWOL for any time in February he had not notified Defendant Rich of his whereabouts 30 minutes before his workday. **[UMF 19]**   He also told Mr. Rodriguez-Ortega that those AWOL's would lead to further discipline including a 5 day suspension, but for his "leniency." **[UMF 20, 28, 29, 30]**   The evidence clearly shows that there was absolutely no way in which Defendant Rich would have allowed Mr. Rodriguez-Ortega to retroactively designate May 5-15 as FMLA because he had not followed the call-in procedure, regardless of the reason he had not followed it.

In May, unlike in February, Mr. Rodriguez-Ortega even gave notice of his need for FMLA leave on his way to the hospital, sufficient that Defendant Rich designated a half day that day as FMLA. This demonstrates Mr. Rodriguez-Ortega 's intent to comply with Defendant Rich's requirement to notify him of absences.  It stands to reason that had Mr. Rodriguez-Ortega not been incapacitated, he would have followed up on his text with additional status as he stated he would.   Instead, each subsequent day that Mr. Rodriguez-Ortega did not call in 30 minutes before his shift, Defendant Rich marked him AWOL. **[UMF 40]**   David Rich repeatedly testified to his belief that his employees had to notify him of their whereabouts, no matter what. If Defendants legitimately had non-FMLA related reasons to terminate Mr. Rodriguez-Ortega ,

they would have properly designated May 5-15 as FMLA leave, and then carried out whatever allegedly non-FMLA related discipline they felt was needed.  But instead, they denied him his federal right to leave on those days, and then they explicitly relied on that illegal denial of leave to terminate him.

As a matter of law, Defendants' termination of Mr. Rodriguez-Ortega interfered with his federal right to protected FMLA leave

### C. Mr. Rodriguez-Ortega is entitled to Summary Judgment on his FMLA Retaliation Claim.

**1. Defendant Rich retaliated against Mr. Rodriguez-Ortega for taking of FMLA leave when Defendant Rich marked him AWOL for some FMLA leave and then stripped Mr. Rodriguez-Ortega's job duties and assigned him the sole responsibility of applying for disability retirement when he returned from leave in or around March 2020.**

"[a] plaintiff may proceed under a mixed motives theory and provide direct evidence of retaliation, although the Tenth Circuit Court of Appeals has questioned whether this approach is applicable in an FMLA retaliation claim." Cordova v. New Mexico, 283 F. Supp. 3d 1028, 1043 (D.N.M. 2017) (citing Twigg, 659 F.3d at 1004).

Defendant Rich's actions and admissions evidence direct evidence of FMLA retaliation. There is no dispute that Mr. Rodriguez-Ortega was marked AWOL for 2.5 days of his hospitalization in February 2020. **[UMF 16, 71]** Defendants do not dispute that Defendant Rich stripped Mr. Rodriguez-Ortega's job duties and told him he had to focus on getting disability retirement instead.  **[UMF 28, 29, 50, 60, 70, 72]** There is no dispute that Mr. Rodriguez-Ortega was terminated for AWOLs in May arising from his hospitalizations and/or incapacitations. **[UMF 82]**

There can be no reasonable dispute that both being marked AWOL and having his job duties stripped and being told to focus solely on retirement was retaliation for being out of the office in February 2020 while hospitalized for his FMLA covered condition. The fact that some of this leave was designated as FMLA and some of it was AWOL (even half a day each) shows that Defendant Rich indisputably knew that the absence was FMLA related, but also that he wished to punish Mr. Rodriguez-Ortega for being absent. Mr. Rodriguez-Ortega was then effectively constructively discharged when his job duties were stripped, which was additional retaliation for the taking of leave.

No reasonable jury could find that being marked AWOL and having his job duties stripped after he returned to work was not directly caused or related to his FMLA protected absences, and therefore as a matter of law constituted a violation of the FMLA. Summary Judgment is therefore appropriate on Mr. Rodriguez-Ortega's FMLA Retaliation claim.

**D.    Plaintiffs are entitled to Summary Judgment on their NMHRA claims.**

"In interpreting our state Human Rights Act, we have previously indicated that it is appropriate to rely upon federal adjudication for guidance in analyzing a claim under the Act…" *Trujillo v. N. Rio Arriba Elec. Coop., Inc*., 2002-NMSC-004, ¶ 8, 131 N.M. 607, 612, 41 P.3d 333, 338. "The Tenth Circuit has stated that in order to maintain a disability discrimination claim under the ADA, a plaintiff must demonstrate '(1) that he [or she] is a disabled person within the meaning of the ADA; (2) that he [or she] is qualified . . .; and (3) that the employer terminated him [or her] because of the disability'" *Id.* at ¶ 8 (quoting ." *White v. York Int'l Corp*., 45 F.3d 357, 360-61 (10th Cir. 1995)). "Despite the textual differences between the NMHRA and the ADA, there is good reason to believe that the New Mexico Legislature intended the NMHRA to

grant the same degree of protection now recognized by the ADA." *DePaula v. Easter Seals El Mirador*, No. 14-CV-252 MCA/SCY, 2015 U.S. Dist. LEXIS 189213, at *18 (D.N.M. Jan. 27, 2015) "The Human Rights Act states that it is unlawful for an employer to discriminate "because of" a medical condition." *Trujillo* ¶ 18.

Under the NMHRA, the proper standard of intent is that the protected characteristic was a "motivating factor" in the adverse action taken against the Plaintiff.  See *Nava v. City of Santa Fe*, 2004-NMSC-039, ¶¶ 8-9, 136 N.M. 647, 103 P.3d 571; *Loggins v. City of Albuquerque*, No. A-1-CA-38901, 2022 N.M. App. Unpub. LEXIS 442, at *11 (Ct. App. Dec. 5, 2022)  ("[T]he intent required for discrimination under the Human Rights Act is that the plaintiff's membership in a protected class "was a motivating factor" in the conduct alleged to be discriminatory.")

13-2307A "Race, gender, and other discrimination under the New Mexico Human Rights Act." Requires that to establish a violation of the NMHRA, Plaintiffs must prove that:

1. The Plaintiff was "otherwise qualified" for the position in question;

2. That the Defendant(s) refused to hire, fired, failed to promote, demoted, or discriminated in matters of compensation terms, conditions, or privileges of employment against the Plaintiff; and

3. That the Plaintiff's membership in a protected class was a motivating factor in the adverse action against the Plaintiff.


**1.   Defendants unlawfully discriminated against Mr. Rodriguez in violation of the NMHRA when they required him to fill out an ADA accommodation form disclosing specific information about his disability before his interview for a promotion.**

The ADA provides that "a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to

the nature or severity of such disability." 42 U.S.C. § 12112(d)(2)(A). The law is clear that an employer is prohibited from making "inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability." *EEOC v. Wal-Mart Stores, Inc.*, No. 98-2122, 1999 U.S. App. LEXIS 33144, at *12 (10th Cir. Dec. 21, 1999)

Here there is no dispute that NMDOH required Plaintiff to fill out forms which illegally asked Plaintiff to disclose his disabilities, including the specific severity of those disabilities. **[UMF #46]** As the NMHRA is interpreted similarly to the ADA, the prohibition on requesting disclosure of disabilities at the job application stage of the hiring process is illegal as a matter of law.  After refusing to fill out this form, Mr. Rodriguez was ranked 5th out of 5 interviewees, and not hired for the position.  There can be no reasonable doubt that having to assert his rights at this interview by refusing to fill out forms he was required to fill out, and therefore appear insubordinate would have been fatal to the interviewing process by making a poor first impression, at the very least. Plaintiffs requested all applications and interview materials submitted by all applicants to the Vaccine Outreach Manager position. Defendants produced three interview scoresheets for Plaintiff and only a single interview scoresheet for another applicant. They produced no records showing anyone else was asked to fill out these forms, and so the evidence supports that only Mr. Rodriguez was required to fill out these forms.

Even were he not the only applicant asked to disclose his disability in granular detail before being interviewed for a promotion, it is still per se illegal to request this of any job applicant. Although the NMHRA does not contain the specific provision rendering this illegal, as it has always been interpreted to contain the same explicit rights as the ADA, it is reasonable to assume that the NMHRA also forbids employers from requiring this information before an

interview. See *DePaula v. Easter Seals El Mirador,* No. 14-CV-252 MCA/SCY, 2015 U.S. Dist. LEXIS 189213, at *17-19 (D.N.M. Jan. 27, 2015).

No reasonable jury could find that Defendants did not violate the NMHRA by requiring Mr. Rodriguez to fill out forms disclosing his disability at his job interview. Additionally, under these facts, no reasonable jury could find that Mr. Rodriguez's disability was not a motivating factor in the decision to not offer him the promotion. Summary Judgment is therefore appropriate on this claim.

> **2. Defendants unlawfully discriminated and retaliated against Mr. Rodriguez in violation of the NMHRA by conducting a fatally biased investigation against him alleging sexual harassment, and then terminating him with no progressive discipline at all.**

Defendants admit that Mr. Rodriguez engaged in protected activity when he reported disability discrimination to Defendant Rich in or around January 2020. **[UMF #45, 46, 47, 48, 49]** Defendants admit that Defendants Rich and Lucero took Mr. Rodriguez's report extremely seriously and feared legal repercussions from it. **[UMF #49]**

Defendants admit that Mr. Rodriguez confronted Vandora Montoya and/or Chasedy Vela about violation of the DOH Weapons Policy. **[UMF #52]** Defendants admit that later the same day, Vandora Montoya reported Mr. Rodriguez for alleged sexual harassment. **[UMF #53]** Defendants admit that Defendant Lucero asked to investigate Mr. Rodriguez, but did not ask to investigate the violation of DOH Weapons Policy by Vandora Montoya and/or Chasedy Vela. **[UMF #55]** Defendants admit that Violations of DOH weapons Policy is the same level 3 terminable offense as sexual harassment. **[UMF #54]** Defendant Lucero placed only Mr. Rodriguez under investigation for a level 3 offense, gave no consideration to the fact that retaliation was a likely motivation for Vandora Montoya and Chasedy Vela to suddenly report

Mr. Rodriguez for sexual harassment at the exact same time they were alleged to have violated the DOH weapons policy. **[UMF #52,53, 54, 55, 59]**  Defendants admit that Defendant Lucero conducted a biased investigation, with all inferences against Mr. Rodriguez, in which he even added his own made-up allegations. **[UMF #56, 57, 58]**   Defendants admit that there was no actual proof that Mr. Rodriguez had done anything alleged. **[UMF #58]** Defendants admit that Defendants Lucero and Rich made the decision that Mr. Rodriguez should be terminated without progressive discipline. **[UMF #61]** Defendants admit that they violated DOH policy by retaining and using years old verbal counseling statements on unrelated issues to substantiate termination. **[UMF #65]** Defendants admit that Mr. Rodriguez's chain of command relied completely on Defendants Lucero and Rich's report and recommendations. **[UMF #64]** Defendants admit that although Defendant Lucero also found Ron Ulibarri and Chris Novak in violation of DOH policy, he did not recommend any discipline, nor were either of them discipline for these violations.  **[UMF #63]**

Defendants admit that there is not a single record of any similarly situated DOH employee being terminated without any progressive discipline based on a first allegation of sexual harassment.   **[UMF #86]**  Defendants admit that it is per se unreasonable to discipline Mr. Rodriguez more harshly than all other similarly situated employees.  **[UMF #87]**

No reasonable jury could find that shortly after receiving a complaint against them for disability discrimination, that the decision to <u>only</u> investigate Mr. Rodriguez for an alleged level 3 disciplinary violation, and not Vandora Montoya and Chasedy Vela who were also accused of level 3 policy violations, was unrelated to his report of discrimination.  No reasonable jury could find that an investigation where the investigator adds in his own fictional allegations against the accused, and lied to the accused about having recorded evidence was legitimate.  No reasonable

jury could find that an investigation with no actual evidence of wrongdoing, and not a single corroborated complaint, made by individuals with a clear retaliatory motive could be legitimate. No reasonable jury could find that violating DOH policy by using old and unrelated verbal counseling statements as evidence against Mr. Rodriguez was legitimate. No reasonable jury could find that terminating Mr. Rodriguez without progressive discipline was legitimate, particularly as there is no evidence that DOH has ever terminated any other employee upon a first allegation of sexual harassment, and has always offered progressive discipline in such circumstances. No reasonable jury could find that Defendants disproportionately harsh discipline of Mr. Rodriguez, resulting from a clearly biased and improper investigation, shortly after he reported disability discrimination was unrelated to his assertion of his disability rights.

For these reasons, summary judgment on Mr. Rodriguez's claim of disability discrimination is appropriate as there are no legitimate disputes of material fact which could cause a jury to find anything but that Mr. Rodriguez's disability and report of discrimination were a motivating factor in his termination.

3. **Defendants Unlawfully Discriminated against Mr. Rodriguez-Ortega when they marked him AWOL while he was hospitalized, and then stripped his job duties when he returned to work and told him he must seek disability retirement.**

There is no dispute that Mr. Rodriguez-Ortega was marked AWOL for 2.5 days of his hospitalization in February 2020. **[UMF 16, 71]** Defendants do not dispute that Defendant Rich stripped Mr. Rodriguez-Ortega's job duties and told him he had to focus on getting disability retirement instead. **[UMF 28, 29, 50, 60, 70, 72]** There is no dispute that Mr. Rodriguez-Ortega told Defendant Rich that he did not want to retire early and that he felt that doing so would be "failing himself." **[UMF #51]** There is no dispute that Mr. Rodriguez-Ortega was terminated for AWOLs in May arising from his hospitalizations and/or incapacitations. **[UMF 82]**

There can be no reasonable dispute that both being marked AWOL and having his job duties stripped and being told to focus solely on retirement was retaliation for being out of the office in February 2020 while hospitalized for his FMLA covered condition.  The fact that some of this leave was designated as FMLA and some of it was AWOL (even half a day each) shows that Defendant Rich indisputably knew that the absence was related to Mr. Rodriguez-Ortega's disability, but also that he wished to punish Mr. Rodriguez-Ortega for being absent because of his disability.  Mr. Rodriguez-Ortega was then effectively constructively discharged when his job duties were stripped because of his health condition.

No reasonable jury could find that being marked AWOL for being absent while hospitalized was not related to the disability which was causing the hospitalization.  Nor could they find that having his job duties stripped and told his only job was to focus on getting disability retirement was not related to his disability.  A reasonable jury could only find that Mr. Rodriguez-Ortega's disability was a motivating factor for both the decision to mark him AWOL and also to strip his job duties and force him to retire. As a matter of law, there is no reasonable dispute of material fact on these issues, and so this Court must grant summary judgment on Mr. Rodriguez-Ortega's NMHRA discrimination and retaliation claim.

**4. Defendants unlawfully discriminated against Mr. Rodriguez-Ortega when they terminated him for absences caused by his disability.**

Under the Human Rights Act, an employer is prohibited from discharging "any person otherwise qualified because of . . . medical condition." Section 28-1-7(A).  *Trujillo v. N. Rio Arriba Elec. Coop., Inc*., 2002-NMSC-004, ¶ 8, 131 N.M. 607, 612, 41 P.3d 333, 338.

There is no dispute that Mr. Rodriguez-Ortega notified Defendants that he was going to the ER on May 4th.  **[UMF #32]** There is no dispute that they were aware of his disability, and that the ER trip was related to it.  **[UMF #34]** There is no dispute that Defendant Rich never attempted to contact Mr. Rodriguez-Ortega or to otherwise learn his whereabouts until May 15th, more than 11 days later. **[UMF #35, 77, 78]**  There is no dispute that Defendants never engaged in any interactive process meeting with Mr. Rodriguez-Ortega, or otherwise attempted to accommodate his disability in any way.  **[UMF #35, 77, 78]**  There is no dispute that Defendants terminated Mr. Rodriguez-Ortega because of his 9 AWOLs, which, as argued fully above, constituted illegal interference with Mr. Rodriguez-Ortega's right to FMLA leave.  **[Doc 23. UMF #82]** These AWOLs, therefore, also constitute illegal discrimination based on the disabilities for which Plaintiff was hospitalized and/or treated.  There can be no reasonable dispute that Defendant Rich resented Mr. Rodriguez-Ortega's disability and the unforeseen absences that resulted from it.

No reasonable jury could find that being marked AWOL for being absent while hospitalized by his disability was not related to his disability. No reasonable jury could find that being marked AWOL while hospitalized/incapacitated and then terminated for having too many AWOLs was unrelated to Mr. Rodriguez-Ortega's disability.  Particularly as Defendants had to also violate Mr. Rodriguez-Ortega's federal rights to do this, there can be no reasonable dispute that Mr. Rodriguez-Ortega's disability was a motivating factor in his termination.   As a matter of law, there is no reasonable dispute of material fact on these issues, and so this Court must grant summary judgment on Mr. Rodriguez-Ortega's NMHRA discrimination and retaliation claim.

**E.    Mr. Rodriguez is entitled to Summary Judgment on his Breach of Implied Contract Claim.**

       **1.    Defendants breached their disciplinary policy agreement not to retain verbal counseling statements for more than a year, and breached their disciplinary policy agreement when they used verbal counseling statements to support Mr. Rodriguez's termination 4 years later.**

"'An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon.'" Garrity v. Overland Sheepskin Co., 1996- NMSC 032, 121 N.M. 710, 714, 917 P.2d 1382, 1386 (N.M. 1996) (quoting Hartbarger, 115 N.M. at 672, 857 P.2d at 783) See also *Elisberg v. Presbyterian Healthcare Servs*., No. 05-CV-461 JCH/KBM, 2006 U.S. Dist. LEXIS 113660, at *7-8 (D.N.M. Aug. 10, 2006)(Employer policies and practices could constitute an implied contract)

NMDOH's "Disciplinary Action" Policy HR.8.10(V)(A)(3) requires "A copy of the documented counseling is to be retained in the <u>supervisor's soft file</u> for the employee **for up to one year** and <u>may be used as the basis for progressive discipline</u> **during this time frame**.

       Defendants admit the DOH Disciplinary Policy creates an implied contract. **[UMF #65]** They admit that DOH Disciplinary policy requires them to retain verbal counseling statements for only up to a year. **[UMF #65]** Defendants admit that DOH Disciplinary Policy does not allow them to use 4-year-old verbal counseling statements to support discipline 4 years later. **[UMF #65]** Defendants breached this implied contractual agreement when they retained Mr. Rodriguez's verbal counseling statements for 4 or more years and then used them to terminate him years later. **[UMF #66]**

There is no reasonable dispute of material fact that Defendants not only retained Mr. Rodriguez's verbal counseling statements approximately 4 times longer than they are allowed, but that they then used them to support his termination four years later, in violation of their policy stating that they can only be used for discipline for "up to one year" after being issued. A reasonable jury could only find that Mr. Rodriguez would have reasonably relied on the implied contract stating that his verbal counseling statements could not be kept or used beyond one year after they were issued. A reasonable jury would find that Defendants breached this agreement. Therefore, Summary Judgment is appropriate here.

**F.    Mr. Rodriguez is entitled to Summary Judgment on his Breach of Good Faith and Fair Dealing Claim.**

"In New Mexico, '[w]hether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement. Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement.'" *Immanuel Presbyterian Church of Albuquerque v. Church Mut. Ins. Co., S.I.*, No. 1:20-cv-00878-KWR-KRS, 2022 U.S. Dist. LEXIS 160789, at *14-15 (D.N.M. Sep. 6, 2022)(quoting *Salas v. Mountain States Mut. Cas. Co.*, 2009- NMSC 005, 145 N.M. 542, 202 P.3d 801, 805 (N.M. 2009))

**1.    Defendants Breached their Duty of Good Faith and Fair Dealing when they knowingly violated their own disciplinary policy to improperly support their termination of Mr. Rodriguez.**

Defendants admit that the DOH Disciplinary Policy created an implied contract. **[UMF #65]** Defendants admit that under this implied contract, they could only retain and use Mr. Rodriguez's verbal counseling statements for up to one year. **[UMF #65]** Plaintiff was deprived

of the benefit of DOH's promise that his verbal counseling would only be kept and/or used for up to a year when they used these counseling statements 4 or more years later.

No reasonable jury could find that Defendants' breach of their own contractual Disciplinary Policy by retaining and using Mr. Rodriguez's verbal counseling statements four or more years later to support his termination was not a breach of the covenant of good faith and fair dealing.  Mr. Rodriguez is entitled to Summary Judgment on this claim.

**G.    Mr. Rodriguez-Ortega is entitled to Summary Judgment on his NMWPA Claim.**

The New Mexico Whistleblower Protection Act provides that a "public employer shall not take any retaliatory action against a public employee" where the employee, inter alia, "communicates to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act" or "objects to or refuses to participate in an activity, policy or practice that constitutes an unlawful or improper act." NMSA § 10-16C-3 (2012). A "retaliatory action" for purposes of the Whistleblower Protection Act means "taking any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." *Id*. at § 10-16C-2(D) (emphasis added). An "unlawful or improper act" means a practice, procedure, action or failure to act on the part of a public employer that, inter alia, "violates a federal or state law, regulation, or administrative rule" or " constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public. Id. at § 10-16C-2(E).

*Carlson v. Bd. of Educ*., No. 10-1195 - JCH/RHS, 2012 U.S. Dist. LEXIS 204045, at *22 (D.N.M. May 1, 2012)

1. **Defendants violated the NMWPA when they placed Mr. Rodriguez under investigation and subsequently terminated him after he reported disability discrimination.**

Defendants admit that Mr. Rodriguez engaged in protected activity when he reported disability discrimination to Defendant Rich in or around January 2020. **[UMF #45, 46, 47, 48, 49]** Defendants admit that Defendants Rich and Lucero took Mr. Rodriguez's report extremely seriously and even feared legal repercussions from it. **[UMF #49]**

Defendants admit that Mr. Rodriguez confronted Vandora Montoya and/or Chasedy Vela about violation of the DOH Weapons Policy. **[UMF #52]** Defendants admit that later the same day, Vandora Montoya reported Mr. Rodriguez for alleged sexual harassment. **[UMF #53]** Defendants admit that Defendant Lucero asked to investigate Mr. Rodriguez, but did not ask to investigate the violation of DOH Weapons Policy by Vandora Montoya and/or Chasedy Vela. **[UMF #55]** Defendants admit that Violations of DOH weapons Policy is the same level 3 terminable offense as sexual harassment. **[UMF #54]** Defendant Lucero placed only Mr. Rodriguez under investigation for a level 3 offense, gave no consideration to the fact that retaliation was a likely motivation for Vandora Montoya and Chasedy Vela to suddenly report Mr. Rodriguez for sexual harassment at the exact same time they were alleged to have violated the DOH weapons policy. **[UMF #52,53, 54, 55, 59]**

Defendants admit that Defendant Lucero conducted a biased investigation, with all inferences against Mr. Rodriguez, in which he even added his own made-up allegations. **[UMF #56, 57, 58]** Defendants admit that there was no actual proof that Mr. Rodriguez had done anything alleged. **[UMF #58]** Defendants admit that Defendants Lucero and Rich made the decision that Mr. Rodriguez should be terminated without progressive discipline. **[UMF #61]** Defendants admit that Lucero and Rich were concerned that Mr. Rodriguez might enforce his

disability rights "and win." **[UMF #49]** Defendants admit that they violated DOH policy by retaining and using years old verbal counseling statements on unrelated issues to substantiate termination. **[UMF #65]**  Defendants admit that Mr. Rodriguez's chain of command relied completely on Defendants Lucero and Rich's report and recommendations. **[UMF #64]** Defendants admit that although Defendant Lucero <u>also</u> found Ron Ulibarri and Chris Novak in violation of DOH policy, he did not recommend any discipline, nor were either of them disciplined for these violations.  **[UMF #63]**   Defendants admit that there is not a single record of any similarly situated DOH employee being terminated without any progressive discipline based on a first allegation of sexual harassment.  **[UMF #86]**  Defendants admit that it is per se unreasonable to discipline Mr. Rodriguez more harshly than all other similarly situated employees.  **[UMF #87]**

No reasonable jury could find that shortly after receiving a complaint against them for disability discrimination, that the decision to <u>only</u> investigate Mr. Rodriguez for an alleged level 3 disciplinary violation, and not Vandora Montoya and Chasedy Vela who were also accused of level 3 policy violations, was unrelated to his report of discrimination.  No reasonable jury could find that an investigation where the investigator adds in his own fictional allegations against the accused, and lied to the accused about having recorded evidence was legitimate.  No reasonable jury could find that an investigation with no actual evidence of wrongdoing, and not a single corroborated complaint, made by individuals with a clear retaliatory motive and immediately recommending termination could be legitimate.  No reasonable jury could find that not disciplining everyone found to have allegedly violated the same DOH policy is legitimate.  No reasonable jury could find that violating DOH policy by using old and unrelated verbal counseling statements as evidence against Mr. Rodriguez was legitimate. No reasonable jury

could find that terminating Mr. Rodriguez without progressive discipline was legitimate,

particularly as there is no evidence that DOH has ever terminated any employee upon a first

allegation of sexual harassment, and has always offered progressive discipline in such

circumstances.  No reasonable jury could find that Defendants disproportionately harsh

discipline of Mr. Rodriguez, resulting from a clearly biased and improper investigation, shortly

after he reported disability discrimination was unrelated to his assertion of his disability rights.

There is no reasonable dispute of material fact that Mr. Rodriguez made a protected

complaint, and was placed under investigation and terminated after having made this report. For

these reasons, Mr. Rodriguez is entitled to the grant of summary judgment on his NMWPA

claim.

**H.    As a Matter of Law, Mr. Rodriguez is entitled to a reversal of SPB's decision upholding his termination.**

**1.    The SPB's decision to uphold Mr. Rodriguez's termination was improper because his termination was in violation of the NMHRA and the NMWPA, and therefore the NMSPB's decision was contrary to law.**

If the Court should find, for the above stated reasons, that Mr. Rodriguez's termination

was in violation of the NMHRA, NMWPA, breach of implied contract and/or good faith and fair

dealing, then that necessarily renders the decision by the SPB as contrary to law, and therefore

must be reversed.

**I.    As a Matter of Law, Mr. Rodriguez-Ortega is entitled to a reversal of the SPB's decision upholding his termination.**

1. **The NMSPB's decision upholding Mr. Rodriguez-Ortega's termination was contrary to law because his termination was in violation of the FMLA, and the NMHRA.**

If the Court should find, for the above stated reasons, that Mr. Rodriguez-Ortega's

termination was in violation of the FMLA, and/or NMHRA, then that necessarily renders the

decision by the SPB as contrary to law, and therefore must be reversed.


## CONCLUSION

For the reasons argued herein, Plaintiffs respectfully request that this Court grant

Summary Judgment in their favor on all their claims, and allow this case to proceed to a trial by

jury to determine damages, and for costs and attorney's fees, and for whatever other relief this

Court deems proper.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing to be served on the

following parties or counsel of record this 27th day of September, 2023, via e-mail:

Paula Maynes
Attorney for Defendants
P.O. Box 25687
Albuquerque, New Mexico 87125
pmaynes@mstlaw.com